# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| **DONNA LIDGE,** | } |
| **Plaintiff,** | } |
| v. | } Case No.: 2:08-CV-00528-RDP |
| **HARTFORD LIFE AND ACCIDENT INSURANCE CORPORATION,** | } |
| **Defendant.** | } |

## MEMORANDUM OPINION

Plaintiff, Donna Lidge, initiated this lawsuit seeking Long-Term Disability benefits under an ERISA-governed disability plan sponsored by her former employer, Honda Manufacturing, and administered by Defendant Hartford Life and Accident Insurance Company ("Defendant" or "Hartford"). This case is before the court on Defendant's Motion for Summary Judgment (Doc. #13), filed on February 13, 2009. The motion is now ripe for review. (Docs. # 14, 15, 16 and 22). For the reasons outlined below, Defendant's motion is due to be denied.

**I.     Legal Standards for Evaluating a Summary Judgment Motion**

   **A.     Standard of Review on Summary Judgment**

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate

the absence of a genuine issue of material fact. *See id.* at 323. Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *See id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable [trier of fact] could [find] for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

B.   **Standard of Review Under ERISA**

ERISA does not define the legal standards against which a court should review an administrator's decision denying benefits. *Firestone Tire & Rubber Co. v. Burch*, 489 U.S. 101, 108-09 (1989). The Eleventh Circuit has, however, adopted the following mode of analysis to review an administrator's decision:

> (1) Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (*i.e.*, the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.
>
> (2) If the administrator's decision in fact is "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end the judicial inquiry and reverse the decision.
>
> (3) If the administrator's decision is "*de novo* wrong" and he *was* vested with discretion in reviewing claims, then determine whether "reasonable"

> grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).
>
> (4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.
>
> (5) If there is no conflict of interest, then end the inquiry and affirm the decision.

*Williams v. BellSouth Telecomms., Inc.*, 373 F.3d 1132, 1138 (11th Cir. 2004); *see also Doyle v. Liberty Life Assurance Co. of Boston*, 542 F.3d 1352, 1360-61 (11th Cir. 2008) (upholding a district court's analysis following the above steps after *Metro. Life Ins. Co. v. Glenn*, --- U.S. ----, 128 S.Ct. 2343 (2008)). If a conflict of interest exists, the reviewing court must consider the conflict a factor in deciding whether the plan administrator has acted arbitrarily and capriciously. *Glenn*, 128 S.Ct. at 2346; *White v. Coca-Cola Co.*, 542 F.3d 848, 853-54 (11th Cir. 2008). The Supreme Court also held in *Glenn* that where, as here, a plan administrator both evaluates claims for benefits and pays benefits claims, a conflict of interest exists. *Glenn*, 128 S.Ct. at 2348.

## II.     Relevant Undisputed Facts

### A.     Plan Provisions

Through her former employment with Honda Manufacturing, Plaintiff was covered under an ERISA-governed Group Long Term Disability Plan issued by Defendant. (Doc. # 15, Ex. A). Under that Plan, Defendant has without question been granted "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Group Insurance Policy." (Doc. # 15, Ex. A, Ex. 2).

The plan provides long term disability ("LTD") benefits for the first twenty-four (24) month period if an insured is unable to perform his or her own occupation, meaning the job he or she held

immediately before becoming disabled. To remain eligible for LTD benefits after twenty-four (24) months, an insured must be unable to perform "any" occupation. (Doc. # 15, Ex. A, Ex. 2). More specifically, for purposes of eligibility for LTD benefits, "Disability" is defined as follows:

> Disability or Disabled means that during the Elimination Period and for the next 24 months you are prevented by:
>
> > (a)  accidental bodily injury;
> > (b)  sickness;
> > (c)  Mental Illness;
> > (d)  Substance Abuse; or
> > (e)  pregnancy,
>
> from performing one or more of the Essential Duties of your Occupation, and as a result your Current Monthly Earnings are no more than 80% of your Indexed Pre-disability Earnings.
>
> After that, you must be so prevented from performing one or more of the Essential Duties of Any Occupation.

(*Id.*).

"Any occupation" is defined by the plan as "an occupation: (1) for which you are qualified by education, training or experience; and (2) that has an earnings potential greater than an amount equal to the lesser of: (a) 50% of your Indexed Pre-disability Earnings; and (b) the Maximum Monthly Benefit shown in the Schedule of Insurance."  (*Id.*). Disability benefits are terminated under the LTD plan "on the first to occur of: (1) the date you are no longer Disabled as defined; (2) the date you fail to furnish Proof of Loss, when requested by us ... ." (*Id.*).

### C.   Plaintiff's Disability Claim

Plaintiff was employed by Honda in its stamping department when she ceased working in October 2003 due to cervical disc disease. (Doc. # 15, Ex. A, Ex. 1 (hereinafter"AR") at 647; Doc. # 15, Ex. A, Ex. 2). Dr. Cezayirli performed back surgery on Plaintiff in January 2004. (AR 492).

In March 2004, Dr. Cezayirli suggested that Plaintiff remain off from work until further notice. (AR 651). After some initial post-operative treatment and rehabilitation under Dr. Cezayirli's care, in May 2004, Plaintiff was referred to Dr. Moon for pain management and further rehabilitation. (AR 483-93, 651).

In a letter dated May 26, 2004, Defendant awarded Plaintiff LTD benefits commencing April 19, 2004. (AR 483-84). After approving Plaintiff's claim for LTD benefits, Defendant referred Plaintiff for a vocational rehabilitation assessment. (AR 13, 21). During the initial assessment, Plaintiff expressed a desire to return to work. (AR 25). Plaintiff reported that she is a college graduate with a degree in political science. She had done some work toward a Masters in Business, and holds a real estate license. (AR 476-77). She has previously worked in various production capacities, as an apprentice adjuster for a masonry company, and as a postal clerk sorting mail. (*Id.*).

On October 6, 2004, Plaintiff's treating physician, Dr. Moon, completed the first of three physical capacities evaluations. (AR 451-52). In the first report, Dr. Moon opined that Plaintiff was capable of sitting, standing, walking and driving up to four or five hours a day, from two to four hours at a time; could lift up to ten pounds occasionally (*i.e.*, up to 33% of the time), but only up to five pounds from waist to overhead; could push or pull up to twenty pounds occasionally (*i.e.*, up to 33% of the time); could climb, balance, stoop, kneel, crouch, and crawl occasionally (*i.e.*, up to 33% of the time); could reach at waist level frequently (*i.e.*, from 34 to 67% of the time); could reach above shoulder level or below waist level occasionally (*i.e.*, up to 33% of the time); could perform handling, fingering and feeling constantly (*i.e.*, from 68 to 100% of the time); and could repetitively use each foot and hand or both hands. (AR 399-400). He placed no environmental restrictions on her. (*Id.*). Dr. Moon's form further states that these restrictions are projected until December 13,

5

2004. Thereafter, he anticipated that Plaintiff would be able to lift twenty pounds from floor to waist occasionally, ten pounds from waist to overhead occasionally, and carry twenty pounds with both hands occasionally, carry fifteen pounds with one hand, and push and/or pull twenty to thirty pounds. The form reflects that Dr. Moon anticipated a return to work date in December 2004. (AR 451-52).

On April 1, 2005, a Labor Market Survey Report (the survey was conducted on March 29, 2005) was prepared by Concentra, an outside vocational rehabilitation service consulted by Defendant. (AR 415-18). This survey revealed the existence of ten available jobs in Plaintiff's geographical area classified as light or sedentary, four of which offered wages comparable to Plaintiff's prior wages. (AR 415, 281). These jobs included teaching assistant, customer service representative, general office clerk, and production supervisor. (*Id.*).

On June 1, 2005, Defendant wrote to Plaintiff requesting previously requested forms from her, including a claimant questionnaire, authorizations, attending physician statements, and an updated Physical Capacities Evaluation Form. Defendant informed Plaintiff that her claim would be closed if the requested information was not received by June 22, 2005. (AR 419-21). Because Plaintiff failed to provide Defendant with the requested information, her benefits were terminated. In the letter terminating Plaintiff's benefits, Defendant informed her of her appeal rights. (AR 404-07).

In connection with the closure of Plaintiff's claim, job placement services through Concentra were also discontinued. The Concentra case worker noted in the report to Defendant that Plaintiff's placement services were being terminated due to lack of compliance and effort by Plaintiff. (AR 281-82).

On July 17, 2005, Plaintiff submitted to Defendant another Physical Capacities Evaluation Form prepared by Dr. Moon on June 23, 2005. This form indicated that Plaintiff was capable of sitting, standing, walking and driving up to four or five hours a day, from two to four hours at a time; could lift up to ten pounds occasionally (*i.e.*, up to 33% of the time), but only up to five pounds from waist to overhead; could push or pull up to twenty pounds occasionally (*i.e.*, up to 33% of the time); could climb, balance, stoop, kneel, crouch, and crawl occasionally (*i.e.*, up to 33% of the time); could reach at waist level frequently (*i.e.*, from 34 to 67% of the time), could reach above shoulder level or below waist level occasionally (*i.e.*, up to 33% of the time); could perform handling, fingering and feeling constantly (*i.e.*, from 68 to 100% of the time); and could repetitively use each foot and hand or both hands. (AR 399-400). Again, he placed no environmental restrictions on her. (*Id.*). The form reflects that these restrictions were in place from December 13, 2004 through December 15, 2005. (*Id.*).

On or about August 10, 2005, Plaintiff provided to Defendant a copy of a fully favorable decision on her application for Social Security Disability Income (SSDI) benefits dated May 11, 2005. (AR 377-85). The Administrative Law Judge's ("ALJ") decision found Plaintiff to have been disabled from March 3, 2003 through the date of the decision. The ALJ noted that his decision was based upon information received from various physicians, including Dr. Willie Askew, Dr. Selwyn Vickers, Baptist Medical Center, Dr. David Cosgrove, Dr. A.M. Reddy, and Dr. Moon, among others. (AR 377-85). After receiving the information on Plaintiff's award of SSDI benefits, Defendant reopened and reinstated Plaintiff's LTD claim. (AR 356).[1]

---

[1] Unfortunately, Plaintiff's receipt of retroactive SSDI benefits resulted in there having been an overpayment of benefits by Defendant. (AR 293).

By letter dated October 28, 2005, Defendant informed Plaintiff that for her disability benefits to continue after April 18, 2006, she would have to establish that she was unable to perform one or more of the essential duties of "any" occupation. In this letter, Defendant requested that Plaintiff submit updated information from her physicians by November 18, 2005. (AR 291-92).

On November 7, 2005, Dr. Moon prepared an Attending Physician's Statement of Continued Disability and another Physical Capacities Evaluation Form. (AR 275-78). The Physical Capacities Evaluation Form indicates that Plaintiff was capable of sitting, standing, and walking up to four or five hours a day, from two-and-a-half to four hours at a time; could lift up to ten pounds occasionally (*i.e.*, up to 33% of the time), but only up to five pounds from waist to overhead; could push or pull up to twenty pounds occasionally (*i.e.*, up to 33% of the time); could drive frequently (*i.e.*, from 34 to 67% of the time); climb, balance, stoop, kneel, crouch, and crawl occasionally (*i.e.*, up to 33% of the time); could reach at waist level frequently (*i.e.*, from 34 to 67% of the time); could reach above shoulder level or below waist level occasionally (*i.e.*, up to 33% of the time); and could perform handling, fingering and feeling constantly with either or both hands or feet (*i.e.*, from 68 to 100% of the time). Consistent with his earlier findings, he placed no environmental restrictions on her. The Attending Physician's statement indicates that Plaintiff can perform similar functions and specifically states that Plaintiff may drive frequently. (AR 275-78).

By letter dated March 21, 2006, Defendant informed Plaintiff that it had determined that she did not meet the definition of "Disability" under the policy on or after April 18, 2006 (*i.e.*, the date on which that term required her to be disabled from "any" occupation). That decision was based in part on the Physical Capacities Evaluation forms completed by Dr. Moon. The most recent medical information in the file was from Dr. Moon in April 2005. (AR 251-55).

In denying Plaintiff's claim, Defendant considered an employability analysis prepared on March 15, 2006. This employability analysis identified occupations for which Plaintiff had transferable skills: referral clerk, temporary help agency, jacket preparer, and batch records clerk. However, this employability analysis incorrectly assumed that Plaintiff was able to "lift/carry/push/pull up to 20 pounds, but only 5 pounds overhead." (AR 256-57). Dr. Moon's Physical Capacities Evaluation form provides that Plaintiff could *lift* up to *ten* pounds occasionally (*i.e.*, up to 33% of the time), but only up to five pounds from waist to overhead and could *push or pull* up to *twenty* pounds occasionally (*i.e.*, up to 33% of the time). The Rule 56 record is unclear as to whether the identified positions require lifting at the incorrectly assumed level. (AR 256-78).

Plaintiff appealed Defendant's decision on April 13, 2006. In her letter initiating the appeal process, Plaintiff stated that she had another doctor's appointment in May, after which she intended to forward medical records. (AR 232). In connection with her appeal, in September 2006, Plaintiff submitted the records of her treating physician, Dr. Willie Askew, who practices internal medicine. Dr. Askew reported that he had treated Plaintiff since October 2003, and most recently saw her on August 9, 2006, but that she was mostly followed by Dr. Cezayirli and a pain doctor. Dr. Askew diagnosed Plaintiff with chronic cervical radiculopathy and back pain. He completed an Attending Physician's Statement of Disability and a Physical Capacities Evaluation form which were submitted on September 8, 2006. Dr. Askew placed the following restrictions on Plaintiff's activities: standing 20 minutes out of an hour, walking 30 minutes out of an hour, sitting 45 minutes out of an hour, lifting no more than 10 pounds, she should avoid reaching or working overhead, he placed no restrictions on pushing, pulling, or keyboard and/or repetitive hand motions, and stated that she may drive occasionally when not taking her medication, but should avoid driving generally. He noted that

9

she was on multiple sedative medications. He stated that she could stoop, kneel, and crouch occasionally (*i.e.*, up to 33% of the time), but should never climb, balance or crawl. Dr. Askew stated that Plaintiff became disabled in October 2003. He further reported that she had surgery in 2004, is in pain 95% of the time, is too sedated for employment, and stated that this is a permanent situation. (AR 235-45). Plaintiff's medications in August 2006 were listed by Dr. Askew as Benicar, Aspirin, Singulair, Lortab and Neurontin. Dr. Askew also prescribed Cymbalta. (AR 187).

After receiving Dr. Askew's forms, Defendant initiated its appeal process and requested updated medical records regarding Plaintiff. (AR 218-28). Defendant received records from Dr. Cezayirli and from Dr. Frank Thomas, a neurologist.[2] Dr. Thomas's impression was that Plaintiff suffered from chronic right C-6 radiculopathy, persistent pain s/p cervical spine decompression, cervical myelopathy, and lower back pain. Dr. Thomas stated that just because he did not find any surgical lesion, did not mean he did not believe Plaintiff was experiencing pain, and he indicated he would work with her to adjust her medications. (AR 212-13). On September 27, 2006, Dr. Thomas's notes indicate that, although Plaintiff complains of hurting pretty badly, she has "not been back to Dr. Kelsey, her pain doctor, in quite some time."[3] (AR 211).

After receiving this additional information, Defendant arranged to have an independent medical review of Plaintiff's claim. Dr. Phillip Marion, who is board certified in Physical Medicine and Rehabilitation and Pain Management, was engaged by Defendant, through Reed Review Services, to perform that independent review. (AR 176-80). Dr. Marion tried unsuccessfully to

---

[2] Plaintiff apparently ceased seeing Dr. Moon when Blue Cross stopped paying for her visits at the time she became eligible for Medicare, upon approval of her SSDI benefits. (AR 149).

[3] Dr. Kelsey's records were not submitted for review on the appeal of the initial denial of Plaintiff's claim. (AR 177).

speak with Dr. Askew on a number of occasions, and based his initial conclusions on the available medical records.

    Dr. Marion concluded that:

> Based upon a review of the available records, the patient has objective spine impairment as a result of surgery performed in 2004 and residual degenerative spine disease. However, she is otherwise independent with activities of daily living, ambulation and not restricted from driving. The cervical spine impairment supports the permanent occupational restrictions/limitations of light duty to sedentary duty.

(AR 178).

    By letter dated November 6, 2006, Defendant informed Plaintiff that Dr. Marion had reviewed her claim on appeal and that it was upholding its earlier decision. (AR 174-75). After this letter, Dr. Marion was able to speak with Dr. Askew about Plaintiff's condition. (AR 172). Dr. Marion reported that Dr. Askew maintained his position that Plaintiff was unable to work secondary to her continued complaints of pain and reported cognitive deficits. However, Dr. Marion also reported that Dr. Askew agreed that there were no objective neurological deficits, no neuro-psychological testing confirming any deficits, she was independently ambulatory and not restricted from driving a motor vehicle. Therefore, Dr. Marion maintained his conclusion that Plaintiff's cervical spine impairment would not preclude her from performing light duty to sedentary duty occupational activities. (AR 172).

    By letter dated December 1, 2006, Defendant notified Plaintiff that it was upholding its prior decision. (AR 167-68). Thereafter, Plaintiff submitted additional medical records from June 2006, including a normal bone scan and a nerve conduction study which stated that there was "no evidence for cervical or lumbar radiculopathy" and "no evidence for a neuropathy involving those extremities was identified." (AR 154-59). However, an MRI performed on June 16, 2009, revealed some disk

11

herniation. (AR 154-59). Despite that MRI reading, Dr. Marion concluded that the "electrodiagnotic evaluation is inconsistent with any reported significant functional limitations." More specifically, "the cervical spine surgery and residual degenerative cervical spine disease is an objective impairment that supports the permanent restriction of a light duty occupational limitation." (AR 138-39). Therefore, Defendant upheld its decision denying Plaintiff LTD benefits based upon the "any occupation" definition of disability. (AR 136).

## III.   DISCUSSION

### A.   Application of the Multi-Step Analysis

The first step for this court in analyzing Plaintiff's claim is to determine whether Defendant was "wrong" in denying Plaintiff's claim for long-term disability benefits under the "any occupation" definition. "[W]hen the court makes its own determination of whether the administrator was 'wrong' to deny benefits under the first step of the *Williams* analysis, the court applies the terms of the policy." *Ruple v. Hartford Life and Acc. Ins. Co.*, 2009 WL 2434999, *6 (11th Cir. 2009) (citing 29 U.S.C. § 1104(a)(1)(D)).

The reasons for the denial of Plaintiff's claim are set forth in detail in Defendant's final denial letter dated December 22, 2006. After reviewing all of the medical records submitted by Plaintiff, Dr. Marion concluded that Plaintiff's cervical spine surgery and residual degenerative cervical spine disease would only support a permanent restriction of a light duty occupational level. However, Plaintiff's treating physicians' conclusions that Plaintiff was disabled were based more on her reported pain levels and the side effects of her prescription pain medications than on any objective physical condition. Dr. Marion's opinion did not address this subjective evidence and, in

fact, could be read to ignore this evidence of "non-exertional limitations."[4] Therefore, the court finds for purposes of this motion only that Defendant's decision to deny Plaintiff LTD benefits was "wrong."

### 1. Determination of Which Standard of Review Applies to the Decision

The court's analysis, therefore, turns to the appropriate standard of review to be applied in this case. Here, it is undisputed that the LTD Plan at issue expressly grants "discretion" to Defendant as Plan Administrator. Under the Plan, Defendant has "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Group Insurance Policy." (Doc. # 15, Ex. A, Ex. 2). Thus, we apply the arbitrary and capricious standard and consider whether "reasonable" grounds supported Defendant's decision.

### 2. Application of the Standard

In applying the arbitrary and capricious standard, "this Court's role is limited to determining whether [Defendant's] interpretation was made rationally and in good faith—not whether it was right." *Guy v. Southeastern Iron Workers Welfare Fund*, 877 F.2d 37, 38 (11th Cir. 1989) (quoting *Anderson v. Ciba-Geigy Corp.*, 759 F.2d 1518, 1522 (11th Cir. 1985) (quoting *Griffis v. Delta Family-Care Disability*, 723 F.2d 822, 825 (11th Cir.1984))). In reviewing a plan administrator's denial of benefits, the district court must weigh multiple factors to determine whether the decision

---

[4] Admittedly, there is some conflict even between Plaintiff's treating physicians. Dr. Moon did not consider these "non-exertional" limitations disabling to Plaintiff in that he did not restrict her from driving and placed much more lenient restrictions on her activities. Dr. Askew, although not a pain specialist, appears to have given much more credence to Plaintiff's complaints of pain and opined that Plaintiff is too sedated to work or drive on her pain medications.

was arbitrary and capricious.[5] *Doyle v. Liberty Life Assur. Co. Of Boston*, 542 F.3d 1352, 1360 (11th Cir. 2008).

Defendant's independent peer review doctor made the decision to deny Plaintiff's LTD benefits without arranging to evaluate Plaintiff in person. While this may be acceptable in some circumstances, *see, e.g. Helms v. General Dynamics Corp.*, 222 Fed.Appx. 821, 833 (11th Cir. 2007), it is puzzling in light of the vastly differing opinions in the records regarding Plaintiff's ability to work. Dr. Moon evaluated Plaintiff's functional capacities and rendered three consecutive opinions which placed restrictions on her physical activities that would have allowed her to work in a light duty or sedentary capacity. He did not restrict her from driving despite her narcotic medications. Nor does it appear that he considered Plaintiff's complaints of pain. Plaintiff stopped seeing Dr. Moon around November 2005, apparently when her insurance stopped paying for her to see him. Thereafter, Plaintiff was followed by Dr. Askew and Dr. Thomas.

Both Dr. Askew and a Social Security Administrative Law Judge [6] came to the conclusion that, based upon Plaintiff's pain level and the sedating effect of her pain medications, she was unable to work at all. The records of Dr. Thomas, a neurologist, also reflect that Plaintiff reported

---

[5] "When conducting a review of an ERISA benefits denial under an arbitrary and capricious standard (sometimes used interchangeably with an abuse of discretion standard), the function of the court is to determine whether there was a reasonable basis for the decision, based upon the facts as known to the administrator at the time the decision was made." *Glazer v. Reliance Standard Life Ins. Co.*, 524 F.3d 1241, 1246 (11th Cir. 2008) (*quoting Jett v. Blue Cross & Blue Shield of Ala.*, 890 F.2d 1137, 1139 (11th Cir. 1989) (internal quotation marks omitted).

[6] The Social Security Administration Law Judge's decision is obviously not dispositive. But the district court may consider these determinations of disability in reviewing a plan administrator's determination of benefits. *Kirwan v. Marriott Corporation*, 10 F.3d 784, 790 (11th Cir. 1994).

significant pain.[7] Because the aspect of Plaintiff's medical condition which she claims makes her disabled is her level of pain and the sedating effect of her medications, her *physical capacity* to sit, stand, lift, and carry[8] following her back surgery and degenerative spine issues is not determinative of whether she is disabled due to pain. Therefore, a finding that Plaintiff is not disabled simply because she has the physical functional capacity to perform sedentary work–and which does not take into account her claim she suffers disabling pain–could be arbitrary and capricious. *See e.g., Hammock v. BellSouth Tele., Inc.*, N.D. Ala CV04-B-2318-S, Opinion p. 19 (Mar 31, 2006).

While it is true that plan administrators are not required to accord special weight to the opinions of a claimant's treating physician, they "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Black & Decker v. Nord*, 528 U.S. 822, 834 (2003). In light of the opinions of Plaintiff's treating physicians, Dr. Askew and Dr. Thomas, and the finding of an ALJ that Plaintiff was unable to work because of her pain, there is a genuine issue of material fact as to whether Defendant arbitrarily discredited reliable evidence. Indeed, it appears the only Rule 56 evidence Defendant can point to which arguably refutes the opinions of Plaintiff's treating physicians and the findings of the ALJ comes from a peer review physician hired by Defendant. As noted above, that doctor did not examine Plaintiff, yet discredited her pain evidence based upon findings that are subject to question. For example, Dr. Marion found

---

[7] Dr. Thomas's notes indicate that Plaintiff complained of burning pain, and that the amount of Neurontin she took due to the pain caused her to be drowsy to the point that she could not function in the workplace.

[8] To be sure, Plaintiff strenuously argues that Defendant's determination that Plaintiff failed to show she was "disabled" from any occupation was flawed for several reasons, including mis-assumptions made by its vocational consultant. (*See* Doc. # 16 at pp. 19-21). But the key issue here is that Defendant's denial of Plaintiff's claim failed to properly take into account the main thrust of her claim–that debilitating pain is what has rendered her disabled.

there was no abnormal neurological findings despite the fact that Dr. Askew and Dr. Thomas found there were. Dr. Marion also relied upon Plaintiff's "normal gait," even though Plaintiff has indicated the bulk of her pain emanates from her neck. In addition, there are disputed issues about whether Plaintiff is restricted from driving and whether the side effects of her medications allow her to work. These and other factual issues must be resolved at trial in order to determine whether Defendant's decision was arbitrary and capricious.

In addition to these concerns–the conflicting nature of the medical records, and Defendant's peer review physician's decision to discredit that evidence supporting Plaintiff's claim–there is another significant issue in this case: did a conflict of interest sway Defendant's decision. As the Supreme Court in *Firestone* and again in *Glenn* held, "if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.'" *Firestone*, 489 U.S. at 115 (*quoting* RESTATEMENT (SECOND) OF TRUSTS § 187, Comment *d* (1959)); *Glenn*, 128 S.Ct. at 2349. "[C]onflicts are but one factor among many that a reviewing judge must take into account." *Glenn*, 128 S.Ct. at 2351. As noted above, in this case the plan administrator both evaluates claims for benefits and pays benefits claims. Accordingly, there is a material issue about whether a conflict of interest exists. *Id*. at 2348. A conflict is certainly one explanation for Defendant's decisions to (1) credit only its third party peer reviewer who did not examine Plaintiff, and (2) discredit not only Plaintiff's subjective complaints of pain, but the opinions of the treating physicians she has more recently seen about her pain level and the sedating effects of her medications.

For the reasons explained above, because (1) the Rule 56 record shows vast disparities between the opinions of Plaintiff's physicians and Defendant's reasons for denial of benefits, and

(2) a conflict of interest may exist here, the court concludes that there are material issues of fact in this case and summary judgment is inappropriate. In reaching this decision, the court is cognizant that the evidence is certainly not wholly one-sided—there is also some evidence in the Rule 56 record that supports Defendant's decision. Therefore, findings of fact must be made with regard to credibility and the probative value of the conflicting evidence in the record. Such findings of fact are not appropriately dealt with at summary judgment; they must be resolved at trial.

### III. Conclusion

As discussed above, Defendant has met not its burden on summary judgment of showing that there exists no genuine issue of material fact and that it is entitled to judgment as a matter of law. Therefore, Defendant's motion for summary judgment is due to be denied. A separate order will be entered.

**DONE** and **ORDERED** this ____16th____ day of September, 2009.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE